On the Merits.
The opinion of the court was delivered by
Egan, J.
The opposition of Chubbuck is not in the record, although opportunity to perfect it in this and other respects has been afforded.. As, however, the substance and nature of it is set forth by the counsel on both sides, and the record affords the means of passing upon it intelligently, we will proceed to do so. It appears that decedent was bookkeeper and cashier of the Loan and Pledge Association, and by virtue of the latter office a director, also. One Mahan was a stockholder, who, it is alleged, desired several years ago to transfer his stock, and was: prevented or not allowed to do so by the president and by the deceased, who, as a director or other officer, also joined in a call of ten per cent on all outstanding stock, whereby it is alleged the stock was greatly depreciated, and heavy loss resulted to the said Mahan, whose stock was> afterward bought up by the association or its president, Benton, at greatly reduced price. Subsequently, in 1874, the opponent purchased at sheriff’s sale for the price of twelve dollars all the rights and claim, of F. C. Mahan, of whatever nature, against said Loan and Pledge-Association or Accommodation Bank (as it was sometimes called), and against any and all of the directors thereof, in either their official or *1004 individual capacity, in consequence of any of their acts in connection with him and with said company, and now wages this opposition, and •claims unliquidated damages against the succession of Woods,-as the transferee of Mahan by virtue of his purchase at the sheriff’s sale. The demand is, to say the least of it, a stale one, and when urged in this form after the death of Woods requires to be supported by strict proof. The district judge thought, and we agree with him, that such evidence was not offered or given. We have recited the precise description given in the sheriff’s deed, or proces verbal, of what was acquired, from which it appears that the particular claim now relied on was not named or described. It is very questionable if a claim for damages in the nature ■of a tort would pass under such description, even if more minute, and whether it would not be confined at most to claims and obligations •growing out of some legal act or pact, and not from “délits or quasi délits.” Were it, however, otherwise, it is by no means clear from the evidence that 'Mahan himself could at the time of his application transfer stock which was at the time pledged by him for a loan from another person, and it does not appear that the certificates were in his possession, or exhibited to the president or deceased at the time of the application to transfer, as required by the rules of the association, and by ordinary prudence in its officers. Neither is the evidence satisfactory that loss resulted from the call for stock. Indeed, ordinary experience would teach us that compliance with the call would have enhanced its ■value to that extent, and at all events that any loaner or pledger interested, or Mahan himself, might have paid the call if need be out of the loan. At all events, his contract with the company as a stockholder was to pay the amount of his stock as called for under the charter until fully paid up, and if injury or loss resulted from such call, it was damnum absque injuries,” and affords no basis for a claim for damages which are never recoverable for the mere enforcement of a legal right or obligation.
The Loan and Pledge Association would seem from the evidence to be a corporation of very questionable vitality, and affording its president and chief manager an opportunity to ply his avocation of manufacturer at Baton Rouge, away from its domicile and place of business In New Orleans, if, indeed, it has any at all. This opposition is based upon an attempt to alter the entries in and boobs of the company, as kept by the deceased, subsequent to his death, and with his widow and ■administratrix necessarily at great disadvantage. To do this reliance is had upon parol evidence of a very loose and unsatisfactory character, which, taken even for all its worth, leaves both facts and amounts in great uncertainty. The chief witness is Benton, the president of the association, who swears in general terms that the deceased must have *1005 made improper entries and charges against the company for money loaned and interest collected on account of the loans, when in point of fact he had not the means to make such loans. He does not pretend to have any knowledge of the particular acts or facts of these entries, which it seems were going on for a long time, and always open to the inspection of the president and directors. The former confesses that he had so much confidence in the deceased that he did not examine the books as he ought to have done. He, however, swears that Woods subsequently admitted to him that he had used moneys of the company for his own purposes, and promised to make it good, and gave a writing to that effect. If so, that writing was the best evidence. It has neither been produced nor legal steps taken to pave the way for the reception of evidence of its contents. It is not shown to have been destroyed, and, if lost, no proper efforts have been made to recover it. Under these circumstances the judge a quo very properly refused to receive or consider the evidence of its contents.
The same witness also swears that the deceased was entitled to only $100 per month salary as bookkeeper, and that the credits on the books of larger amounts or at higher rates in his favor should be disallowed, or rather disregarded, and his succession made to account for these sums, also. It appears that $100 per month was the 'salary due deceased as bookkeeper only. He was subsequently made cashier, also, and it is elsewhere shown by the same witness that the former cashier received $2000 per annum, or, perhaps, $1800. No resolution or action of the directory, nor any contract or understanding -with the deceased that he should perform the duties of cashier for less than his predecessor, is shown. It was unreasonable to expect him to perform the additional duties of another office, and one so important, without additional compensation, also. It does not appear that the items in question were overcharges under the circumstances. As to the ability of the deceased to make the loans to the company upon the want of which, and not upon any knoioleclge to the contrary, the witness relies, it appears from his own testimony that the deceased owned a house which had cost him several thousand dollars, and which, as was not uncommon at that time, he may have used as a basis of credit to make the capital so invested active and interest-producing instead of dead or inactive, and that the witness himself bought from him stock to the amount of over $2800, although he says that was raised to liquidate the indebtedness of deceased — to whom or for what purpose is not shown. The entries on the books charging the company with the loan correspond in date and amount with this transaction, and it is at least singular that they should have been made by the deceased with so much boldness, if in fact, as charged, he was a defaulter; or, at all events, that he should have *1006 afforded by his own entries on the books of the company as to this and •other matters so ready a means for his own detection. It also appears on the books, and is equally singular according to the theory of the ■opponent, that in less than a month afterward, in June, 1872, the deceased charged himself with $1200 loaned money returned to him, ¡and at different times with small sums of from twenty dollars to fifty dollars interest on loans paid him, thus multiplying- the means of •detection and evidence against himself, if there was no foundation for xhe entries. Another, and perfectly disinterested witness, Yan Benthuysen, also avers that he bought three lots from the deceased, and paid him $6000 cash for them. So that, taking into account this sum, the $2850, price of stock, and the amounts derived from current salary due monthly, and if not drawn properly chargeable against the company in favor of the deceased, and without reference to other means or sources ■from which moneys might have been derived, as shown by this record, the argument that the deceased did not make the loans to the company 'because he could not has no great weight, especially in view of the evidence of the same witness, Benton, that he himself made advances, but •of his own means, in buying up stock for the benefit of the company, 'which does not seem to have been independent of aid from its own offi•cers at times. There are other and minor items which it is unnecessary ‘to discuss. The deceased seems to have been so implicitly trusted by the president, directors, and company while living that the offices of ‘bookkeeper and cashier were combined in his person. The books, ¡always open to inspection, were kept in a manner far from suspicious, ¡and very unusual for one seeking to defraud. He is dead, and his voice ■and evidence sealed forever. That of the president, upon whose testimony the opponent relies almost entirely, even if given all the weight which can be claimed for it, fails to make opponent’s case certain or satisfactory. The demand is waged against a succession on items origin¡ating, if at all, years since, and which do not appear to have been legally demanded during the life of decedent, and while the books kept by the deceased might not have been receivable at his instance or that of his administratrix in his own favor, they were offered as they appear with entries both of debit and credit by the opponent, who is, therefore, bound by them, unless they are satisfactorily contradicted, or shown by other evidence to be false. This has not been sufficiently done in a contest waged under these circumstances, and at this late day, after the death of the deceased, and based solely on parol evidence of the grossest violations of law and common honesty in one whose good character ¡and standing for years while living is shown by the evidence of the ■opponents themselves. The district judge heard and saw the witnesses; be is intelligent and capable, and thought that the opponent’s claim *1007 should be rejected. The record before us does not warrant us in arriving at a different conclusion. Neither are we prepared to say that he erred in ordering stricken out or in refusing to consider the evidence in chief of a witness in the absence and by reason of the failure to produce at the same time the cross-examination of the same witness, or in refusing to receive or consider after the submission of the cause, on the evidence then on file, evidence sought to be filed subsequently — matters raised by two bills of exceptions taken by opponent.
The judgment below rejected the oppositions both of Chubbuek and of the Loan and Pledge Association. It was correct, and is affirmed.